NOT DESIGNATED FOR PUBLICATION

No. 120,030

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

EMMANUEL ELLIE,
*Appellee*,

v.

STATE OF KANSAS,
*Appellant.*

MEMORANDUM OPINION

Appeal from Johnson District Court; SARA WELCH, judge. Opinion filed August 23, 2019. Affirmed in part and reversed in part.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Emmanuel Ellie*, appellee pro se.

Before GARDNER, P.J., PIERRON, J., and BURGESS, S.J.

PER CURIAM: After a three-day trial, a jury convicted Emmanuel Ellie of rape, aggravated kidnapping, and aggravated battery. Ellie later filed a K.S.A. 60-1507 motion, alleging ineffective assistance of counsel. The district court granted the motion, finding Ellie's trial attorney had a financial conflict of interest that adversely affected his representation. The court alternatively found cumulative error deprived Ellie of a fair trial. The district court reversed Ellie's convictions, vacated his sentences, and ordered a new trial. The State appeals, arguing the district court applied the wrong legal standard to the attorney's conflict of interest.

1

The State's primary argument on appeal is that the district court applied the wrong legal standard to attorney Mikeal Hagerdon's conflict of interest. The court applied the adverse effect standard identified in *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). In these circumstances, the defendant must show "an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. at 348. If the defendant can show this, the reviewing court again presumes prejudice. *State v. Galaviz*, 296 Kan. 168, 184, 291 P.3d 62 (2012).

But the State argues the court should have applied the prejudice standard from *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To prevail on this kind of claim, a criminal defendant must show (1) defense counsel's performance was deficient under the totality of the circumstances, and (2) prejudice, i.e., a reasonable probability exists the jury would have reached a different result absent the deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014) (relying on *Strickland*, 466 U.S. at 687).

We resolve this case by first finding there was reversible cumulative error. We will not address the issue of whether there was a substantial financial conflict of interest as our first finding makes further findings unnecessary.

In a cumulative error analysis, we collectively consider all errors, even if those errors would individually be harmless, to determine if their combined effect denied the defendant a fair trial. In conducting this analysis, we examine the errors in the context of the entire record, considering how the district court dealt with the errors as they arose; the nature and number of errors and their interrelationship; and the strength of the evidence. *State v. Williams*, 308 Kan. 1439, 1462, 430 P.3d 448 (2018).

The only trial errors Ellie has alleged all relate to defense counsel's representation. The district court found the following errors denied Ellie a fair trial:  (1) Defense

counsel's failure to file a motion in limine to keep out evidence of Ellie's Halloween costume; (2) his comments during closing argument; (3) his failure to timely file a rape shield motion; (4) his failure to locate W.H.; (5) his inadequate trial preparation; and (6) his failure to research the State's upward durational departure or explain it to Ellie. We agree that these cumulative errors had a substantial impact on the verdict.

Defense counsel made many errors, many of which were interrelated. But no prejudicial error will be found if the evidence against the defendant is overwhelming. *State v. Anderson*, 308 Kan. 1251, 1267, 427 P.3d 847 (2018). The evidence supporting Ellie's aggravated battery charge was overwhelming. The evidence supporting his other charges, while sufficient, was not overwhelming. Thus, only Ellie's convictions and sentences for aggravated kidnapping and rape are reversed and vacated.

FACTS

The following facts are taken mainly from W.H.'s preliminary hearing testimony.

In October 2011, Ellie and W.H. had been dating for about a year, and W.H. believed they were in an exclusive relationship. On October 31st of that year, W.H. went to a bar with a female friend. While out on the bar's balcony, W.H. saw Ellie get into a car with another person and drive out of the parking lot. W.H. assumed the other person was a woman, and she became upset. She called Ellie and accused him of cheating, but Ellie laughed and denied it. W.H. told him it was over.

W.H. went back into the bar and ran into Ellie's friend, Rodney Blue. The two hung out and eventually went back to Blue's apartment where W.H. performed oral sex on Blue. After a few minutes, W.H. stopped because she felt like she was cheating on Ellie. Blue told her she could sleep on his couch, so she laid down and fell asleep.

3

W.H. woke up to Ellie walking in the door and punching her. He hit her at least 10 times and knocked her to the floor. He then started kicking her in the mouth and all over her body. Ellie called her names and accused her of having sex with Blue, but W.H. denied it. Ellie ripped off W.H.'s clothes. He then said, "If you want to act like a whore, I'll treat you like a whore" and shoved his fingers into her vagina several times.

Blue and Brandon Clarke, Ellie's roommate, were also in the apartment. Blue told Ellie he did not want W.H.'s blood on his carpet. Ellie grabbed her hair and Blue picked up her feet. W.H. grabbed onto the door frame to stop them from dragging her outside naked. She saw Ellie throw her jacket over the balcony, and she thought they were going to do the same to her.

The two men managed to drag W.H. outside anyway. W.H. believed Ellie kicked her once more. A neighbor then opened the door, scaring the men. Ellie and Clarke ran down the stairs. Blue eventually followed. W.H. remembered crawling down the stairs, hearing sirens, and collapsing.

Officers found W.H. stumbling in the parking lot, covered in blood, and wearing only a jacket given to her by a neighbor. An ambulance took W.H. to the hospital. The trauma surgeon who treated her testified she had several abrasions, contusions, and a fractured jawbone. That fracture allowed one side of her jaw to move independently of the other. According to the surgeon, a tremendous amount of force is needed to break a jawbone this way.

When a police officer tried to talk to W.H. at the hospital that night, she said she did not want to identify her attacker because she did not want him to get in trouble. When asked if she had been sexually assaulted, she said no. She also said she did not want a rape kit.

At the apartment building, a bystander led officers to the building from which W.H. had come. Clothing was strewn about on the lawn and sidewalk, and blood was on the sidewalk and stairwell of the building. A trail of blood led to Blue's apartment. Inside, officers saw blood on the floor and walls. A bloody handprint was on the wall by the door. They also found an empty condom wrapper in the living room.

When W.H. later learned about the condom wrapper, she asked for a sexual assault exam. W.H.'s blood was present on a vaginal swab taken as part of the exam. But no test could tell if the blood came from an injury or menstruation.

The State eventually charged Ellie with one count of rape, one count of aggravated kidnapping, and one count of aggravated battery. All three counts were charged as domestic violence offenses. Blue and Clarke were also charged. The charges against Clarke were eventually dismissed. Blue pleaded guilty to reckless aggravated battery.

In November 2011, Ellie appeared in court with counsel. In January 2012, the district court granted that counsel's motion to withdraw and appointed a public defender, Kelly Goodwin. Goodwin represented Ellie until July 2012, when Ellie hired Paul Franco. Franco, who was licensed in Missouri but not Kansas, was granted permission to practice pro hac vice, and he hired Mike Hagerdon as local counsel. The court later revoked Franco's permission to practice pro hac vice because Franco had omitted necessary information on his application. Hagerdon then became Ellie's lead counsel.

Before trial, the State moved to admit W.H.'s preliminary hearing testimony at trial, alleging she was an unavailable witness. After a hearing, the district court granted the motion. The court held two more hearings with counsel for both parties to determine what parts of her testimony would be redacted at trial.

*Trial*

Ellie's trial took place from January 28-30, 2013. On the first day, Hagerdon objected to proceeding without W.H. being present as well as to reading W.H.'s preliminary hearing testimony into the record. The district court overruled his objections.

Hagerdon also asked the district court to admit evidence about W.H.'s previous sexual conduct. Hagerdon wanted to admit Blue's statement to police that he had had sexual contact with W.H. before the night in question. The court told Hagerdon he should have filed a written motion under K.S.A. 2012 Supp. 21-5502 (commonly known as the rape shield statute) at least seven days before trial to get the evidence admitted. Even so, the court waived the time requirement but ordered Hagerdon to comply with the remaining requirements, including an accompanying affidavit. Ultimately, Hagerdon could not file the motion because Blue refused to sign the affidavit.

In addition to having W.H.'s preliminary hearing testimony read into the record, the State called 11 witnesses, including Clarke and Blue. Clarke's version of events conflicted with W.H.'s. He testified he and Ellie went out together on October 31, 2011. On their way home way, Blue either texted or called Ellie to say W.H. was at Blue's apartment. Ellie wanted to go over there to see if W.H. was cheating on him.

When Clarke and Ellie got to their apartment, Ellie went inside and removed the Halloween costume he was wearing, which included a Scottish kilt and a large fake penis. A photograph of the costume was later admitted into evidence. The two then drove to Blue's apartment.

When they arrived, Ellie went to Blue's apartment. Clarke stopped to talk to Blue, who was outside. Clarke asked Blue what was going on. Blue would not answer, so Clarke ran up to the apartment. The door was open, and he saw Ellie pulling W.H. from

6

the bedroom into the living room. W.H. was naked and had some sort of white cloth over her.

Ellie shut the apartment door. From outside, Clarke could hear yelling and screaming, as well as sounds of a physical altercation. After about five minutes, Blue opened the door, and Clarke saw Ellie standing over W.H., who was on the floor naked. W.H.'s face was bleeding profusely, and blood was all over the apartment. Ellie punched her several times, called her names, and then kicked her twice. Clarke went into the apartment and took a picture with his cell phone.

Clarke went outside and then saw W.H. being dragged out of the apartment naked. She grabbed the door frame, trying to stay inside the apartment, but Blue broke her grip. Clarke saw Ellie standing over W.H., who was curled up on the ground. Clarke took another picture of W.H. with his cell phone. That photograph was admitted into evidence.

After Ellie either punched or kicked W.H. again, a neighbor offered to call the police, and W.H. began screaming. Clarke and Ellie left in Clarke's car.

Blue's version of events conflicted with both W.H.'s and Clarke's. Blue testified he and W.H. went to his apartment. Blue texted Ellie to tell him W.H. was at his apartment "being flirtatious." Ellie responded, "[G]o ahead and do what you got to do." Blue then had sex with W.H. in his living room.

Afterwards, Blue went outside to smoke a cigar, and Ellie and Clarke arrived. Ellie asked Blue, "[D]id you do it?" and Blue responded, "[Y]eah." Ellie went to Blue's apartment. Blue and Clarke followed, but when they got there, the door was closed. Blue tried to open it, but it was locked. Blue and Clarke were outside for several minutes, and Blue could hear both Ellie and W.H. yelling. When Ellie finally opened the door, W.H. was lying on the floor, naked and bloody.

7

Blue testified he picked up W.H. and, cradling her, walked toward the front door. He set her down by the door when she began yelling and struggling. Ellie pulled on W.H.'s feet and she grabbed the doorframe. Blue removed her hands from the doorframe, because he was worried Ellie would shut her hands in the door. Blue then gathered W.H.'s clothes and purse and set them near her, but Ellie threw them over the railing. Blue said he did not see Ellie kick, hit, or punch W.H.

During closing arguments, Hagerdon attacked W.H.'s credibility, highlighting her inconsistent statements and her failure to appear at trial. He emphasized the State had not produced any physical evidence of a rape. He noted discrepancies between W.H.'s, Clarke's, and Blue's testimonies. He also suggested W.H. may have received her injuries by passing out and falling down the stairs.

Hagerdon also made these comments to the jury:

"Now, they also want to talk about the amount of blood she lost. Uh-oh. What they want you to think about is, oh, she's wandering around the yard and she's naked. Okay, that I understand. To most of us, that would be very disturbing.

"Except you have to remember, this woman was an [exotic] dancer as a living. Her job was to walk around naked.

"Was she so upset that she got clothes? Her clothes are laying on the ground. If she wants to get dressed, all she has to do is go get her clothes and get dressed. But she's not.

"She's wandering around the yard, around this apartment complex, by her own testimony, with no clothes on. To her, this is just another day at the job.

. . . .

"Now, again, the State wants you to think that the reason she keeps passing out is not because she's drunk, not because she's high, but from loss of blood.

"Then they brought in all this evidence of all this blood. Again, not to trivialize the injuries, but this is it? This is the loss of blood? This is what they're talking about?

8

"Ladies and gentlemen, I would submit that paper cuts would cause more blood than this. But, again, if you think that these blows—you need to consider all of these factors in whether or not—just how severe this injury actually was."

The jury convicted Ellie on all counts. The State had moved for an upward departure for the aggravated battery and aggravated kidnapping charges but withdrew the motion after receiving the verdict. The district court sentenced Ellie to a total prison term of 320 months.

*Direct Appeal*

Ellie appealed his convictions and sentences, arguing: (1) insufficient evidence supported his aggravated kidnapping conviction; (2) the district court erred in allowing the State to present W.H.'s preliminary hearing testimony at trial; (3) the district court erred by denying his motion for mistrial; and (4) the district court violated his constitutional rights when it sentenced him to the highest term in the sentencing grid box. This court rejected all his claims. *State v. Ellie*, No. 110,454, 2015 WL 2342137 (Kan. App. 2015) (unpublished opinion).

*K.S.A. 60-1507 Motion*

Ellie then filed a K.S.A. 60-1507 motion, arguing Hagerdon had a financial conflict of interest because he did not receive payment from Ellie or Franco for his representation. He also claimed Hagerdon was ineffective for (1) failing to locate W.H.; (2) failing to admit evidence under the rape shield statute; (3) failing to properly conduct voir dire; (4) failing to object to evidence of Ellie's Halloween costume; (5) highlighting W.H.'s nudity in cross-examination and closing argument; (6) failing to argue for inclusion of W.H's statement at preliminary hearing about the number of broken bones she had; (7) failing to properly cross-examine the crime scene expert; (8) failing to object to admission at trial of Blue's cross-examination of W.H. at the preliminary hearing; (9)

9

being unprepared to go against with the State's departure motion; (10) failing to effectively represent Ellie during plea negotiations; and (11) cumulative error.

At a motions hearing, the district court summarily denied several of Ellie's claims. Applying the standard under *Strickland*, the court dismissed Ellie's claim that Hagerdon should have objected to the reading of Blue's cross-examination of W.H. It found Blue's cross-examination was more thorough than Ellie's because Blue had cross-examined W.H. first. It also found Ellie elicited much of the same information Blue did.

The district court next denied Ellie's claim that Hagerdon had failed to properly conduct voir dire. During voir dire, three jurors had said they had some previous experience with domestic violence or abuse. Hagerdon asked to strike two of the jurors after the court suggested more questioning. The third juror did not sit on the jury. Hagerdon also asked the panel, "[I]s there anyone here that is going to have a problem—that would have a problem believing that a woman may make up a story just to get somebody in trouble?" The court found Hagerdon's performance was not constitutionally ineffective in this regard.

The district court denied Ellie's claim that Hagerdon was ineffective for failing to object to evidence of the Halloween costume. The court found the costume was irrelevant, and it would have sustained any objection. But it also found the error did not render the verdict unreliable.

Finally, the district court found Hagerdon was not ineffective for failing to argue for inclusion of W.H's statement that she had 14 broken bones. The court acknowledged the statement would have conflicted with the trauma surgeon's testimony and would have been another inconsistent statement from W.H. But the court held the statement would not reasonably have resulted in a different verdict.

10

The district court held an evidentiary hearing on the rest of Ellie's claims. Franco, Hagerdon, Ellie, and Goodwin all testified at the hearing. Ellie also called two other witnesses as experts.

Franco testified he and Ellie had agreed to a fee of $6,500 to $7,500 for representation, with a $2,500 deposit. Franco received some of the fee from Ellie's father, but he could not remember how much. Franco intended to pay Hagerdon $100 per appearance as local counsel.

Hagerdon testified he took over the case when Franco's pro hac vice status was revoked because he knew Franco could not afford to repay the money he had received from Ellie's family. Hagerdon was supposed to receive the remainder of Franco's fee, but he never did. He only got an additional $400 from Ellie's family.

Hagerdon believed Ellie needed more help than Hagerdon was able to provide. He told Ellie he did not have the funds to do a proper investigation. Hagerdon wanted to hire an investigator to canvas Blue's apartment complex and Ellie's family gave him money to do so. But the investigator Hagerdon spoke to said it would cost a lot more than Hagerdon had available. So Hagerdon used that money for his expenses such as gas.

Hagerdon recommended that Ellie fire him and ask for a public defender because a public defender would have funds available for investigation. But Ellie wanted Hagerdon to represent him. Hagerdon did not try to withdraw, because he believed the district court would not allow it unless Ellie had another attorney lined up.

The State offered Ellie a plea deal to kidnapping and aggravated battery. Hagerdon knew Ellie was not a United States citizen, and he believed Ellie would not have taken any deal that would result in deportation. But he recommended Ellie take the plea deal. He explained to Ellie the State had a strong case on the aggravated battery charge. The

jury would then assume Ellie was guilty of the other two charges because he had beaten W.H.

Hagerdon knew about W.H.'s previous sexual encounter with Blue early on in the case. He also knew he needed to file a rape shield motion seven days before trial to get the evidence admitted but did not do so. He later tried to file the motion during trial, but Blue refused to sign the affidavit. When asked why he did not get Blue's affidavit earlier, Hagerdon responded, "At the time . . . I was incredibly busy and . . . I literally did not have time to do this case. I imagine it was just a time factor."

Hagerdon also did not consider a motion in limine to keep out evidence of Ellie's Halloween costume because he did not have time. Hagerdon admitted his lack of financial gain from Ellie's case affected his performance. He stated he could not put his other cases on hold to work on Ellie's case because "[he] still had bills [he] had to pay."

Hagerdon spent around 40 to 60 hours preparing for Ellie's trial. He met with Ellie in jail nine times. But he also told Ellie he was not going to be adequately prepared for trial.

Hagerdon's main defense at trial was W.H.'s credibility. He told Ellie the State could not proceed to trial if W.H. did not show up. He did not change that advice until the district court ruled W.H.'s testimony from the preliminary hearing would be admissible at trial. Hagerdon believed W.H.'s unavailability benefitted the State because Hagerdon could not cross-examine her.

As for closing argument, Hagerdon suggested the State was trying to show W.H. was in shock by producing evidence that she was walking around the complex nude. According to Hagerdon, it was his theory and belief that because of W.H. was an exotic dancer, "she was used to being in front of people nude and this was not anything unusual

12

for her. She was very comfortable doing it." He did not consider whether such an argument might offend any jurors or any women in the courtroom, and he was surprised to learn one of the jurors had been very offended. In hindsight, he admitted the argument may have been particularly detrimental given the State's theory that Ellie had no respect for women.

As for the "paper cut" comment, Hagerdon said if Ellie had beaten W.H. in the apartment as badly as the State claimed, more blood should have been in the apartment. He acknowledged blood splatter was on the carpet, but he claimed he "[had] seen paper cuts that have produced blood like that." He explained he was trying to argue even small facial injuries produce a lot of blood, so her injuries must have occurred outside of the apartment.

Hagerdon admitted he had not done any research on upward durational departures in Kansas before the jury instruction conference. He also had not talked to Ellie about what his sentence would be if the district court granted the departure.

Ellie testified Hagerdon came to see him after Hagerdon took over as lead counsel. They did not discuss a separate fee arrangement, and Ellie assumed Hagerdon would continue based on the fees he had already paid. Ellie stated Hagerdon never told him he had other cases to take care of or that Ellie should fire him.

According to Ellie, neither Hagerdon nor Franco ever went over police reports or Blue's or Clarke's possible testimony with him. Hagerdon came to visit him in jail for a total of about nine hours. Ellie had a lot of papers from his first two attorneys, including discovery and motions, and Hagerdon would answer his questions about the papers during those visits.

Ellie testified Hagerdon did not advise him on the plea deal. Before the plea deal, the parties tried mediation while Ellie was represented by Goodwin. Ellie stated a district court judge told Ellie the evidence did not support the rape or kidnapping charges. When the State later offered Ellie a plea, Hagerdon answered Ellie's questions about the plea but did not advise him on the offer. Ellie said the main reason he did not accept the plea was he believed the mediation process had established he was not guilty of anything but aggravated battery.

Goodwin testified she met with Hagerdon the week before trial. He seemed unfamiliar with the photograph Clarke had taken of W.H. after the beating. When she asked if he had looked at the State's file, he said he had not. He also seemed to believe the case would be dismissed if W.H. did not show up for trial.

Paul Morrison, a criminal defense attorney, also testified at the hearing. He estimated he usually spends four or five hours preparing for every hour spent in trial. He said he would have filed a motion in limine to exclude evidence of Ellie's costume. He also believed Hagerdon's comments about W.H.'s nudity were counterproductive and inappropriate. He believed Hagerdon's closing argument did not have a coherent theme. Hagerdon did not appear to have a good understanding of the facts of the case, which is critical to strategic decisions. Morrison told the court, "[I]t almost looked like he wasn't expecting the trial to go and then it did at the last minute and he wasn't prepared, would be my guess."

The district court granted Ellie's motion and reversed his convictions. The court held an actual conflict of financial interest existed between Ellie and Hagerdon which adversely affected Hagerdon's representation. It found Hagerdon had taken over as lead counsel because Franco could not repay the fees he had received, and Hagerdon remained on the case with no compensation. Hagerdon had admitted Ellie needed more help than Hagerdon could provide, and he could not adequately prepare for trial because of time

14

constraints. Hagerdon even told Ellie he would not be prepared for trial but failed to ask for a continuance. The court also held that Ellie only needed to show the financial conflict adversely affected Hagerdon's performance, and he need not show prejudice.

The district court also held cumulative error entitled Ellie to a new trial. The court found Hagerdon made the following errors: (1) failure to file a motion in limine to keep out evidence of Ellie's Halloween costume; (2) his comments during closing argument; (3) failure to timely file a rape shield motion; (4) failure to locate W.H.; (5) inadequate trial preparation; and (6) failure to research the State's upward durational departure or explain it to Ellie. Error number 5 appears to be the most serious.

The State appeals. Ellie cross-appeals, but he does not challenge any of the district court's rulings in his appellate brief.

ANALYSIS

The district court found Hagerdon had erred by failing to file a motion in limine to exclude evidence of Ellie's Halloween costume. Again, the court linked this error to Hagerdon's conflict. This is supported by substantial competent evidence. Hagerdon admitted he did not consider filing the motion because he did not have enough time. While the court stated the costume was "offensive and crude," the court found it did not undermine confidence in the outcome of Ellie's trial.

The State argues Ellie cannot show prejudice on this point because the evidence would have been admissible even if Hagerdon had filed a motion in limine to exclude it. Generally speaking, all relevant evidence is admissible. K.S.A. 60-407(f). K.S.A. 60-401(b) defines relevant evidence as evidence having "'"any tendency in reason to prove any material fact.'" [Citation omitted.]" *State v. Page*, 303 Kan. 548, 550, 363 P.3d 391

15

(2015). Evidence is material when the fact it supports is in dispute and is significant under the substantive law of the case. *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016). "'Evidence is probative if it furnishes, establishes, or contributes toward proof.'" 305 Kan. at 47.

The State argues the evidence of Ellie's costume was admissible because "[it] exhibited Ellie's level of disregard for women in general . . . [and] his disregard for [W.H.]" According to the State, his Halloween costume "made it easier for the jury to comprehend how Ellie could have been so brutal in his beating and rape of [W.H.]" The State does not explain how Ellie's costume showed a disregard for women or a capacity for violence. Instead, as the district court held: "[I]t was . . . a crude costume that demonstrated . . . poor taste and an indifference to how such an overtly sexual Halloween costume might offend both male and female sensibilities."

The State also claims "[t]he costume increased the credibility of other evidence, like Ellie cheating on [W.H.] with multiple women, and why he might not care that [W.H.] had previously slept with Blue (with his permission), but then got angry when she did not ask for permission to sleep with him Halloween night." Though the State does not explain how this costume could help prove Ellie was cheating, the evidence that Ellie was cheating on W.H. was uncontroverted. No evidence of Ellie's reaction to the alleged prior sexual contact between Blue and W.H. was admitted at trial. Thus, evidence of Ellie's Halloween costume would have done little, if anything, to bolster these claims.

It is worth noting that the judge who presided over the motion proceedings also presided over the trial. At the motions hearing, the judge held she "certainly would have sustained" any objection to the costume because it was not relevant. Thus, evidence of Ellie's costume would likely not have been admitted at trial if Hagerdon had filed a motion in limine. Regardless, while the Halloween costume did not paint Ellie in a good

16

light, it likely did not change the outcome of his trial, as it did not directly relate to any of the charged crimes.

*Hagerdon's Failure to Timely File a Rape Shield Motion*

The district court also found Hagerdon erred by failing to timely file a rape shield motion to admit Blue's statements about his previous sexual contact with W.H. The court linked this to Hagerdon's lack of time to prepare. The court stated it likely would have admitted the evidence had Hagerdon timely and correctly filed the motion.

Even so, the district court held this error did not prejudice Ellie for three reasons. First, the court waived the time requirement, allowing Hagerdon to file the motion during trial. Second, Blue refused to sign the affidavit, and his credibility was questionable. Third, while this evidence would have challenged the State's motive of jealousy, it was not enough to overcome all the other evidence of this motive. The evidence supports the court's findings and legal conclusions.

*Hagerdon's Failure to Locate W.H.*

Ellie argued Hagerdon erred by failing to locate or subpoena W.H. The district court agreed, holding Hagerdon was deficient for not trying to locate a witness he considered crucial to the defense. But the court declined to find this failure prejudiced Ellie. The court noted many of W.H.'s inconsistent statements were admitted into evidence, and W.H. was not at trial to explain or deny the inconsistencies. Hagerdon was also able to argue that W.H. "had not bothered to show up for the trial wherein she claims she was raped and beaten." Not only did Ellie fail to show prejudice for the reasons the court listed, Ellie also did not suggest what W.H. may have testified to at trial that would have changed the verdict.

17

*Hagerdon's Closing Argument*

In his motion, Ellie argued Hagerdon was ineffective because he argued to the jury that W.H. was comfortable being outside naked because she was an exotic dancer and that a paper cut would result in more blood then was present at the crime scene. The district court found these comments constituted deficient performance:

"The remarks [about W.H. being accustomed to being naked because she was an exotic dancer] had no legitimate strategic purpose and showed a lack of insight as to what is found offensive within this community.

"Given the fact that one charge is rape in this case, it is entirely possible that some members of the jury could transfer Mr. Hagerdon's tasteless and offensive arguments onto Mr. Ellie.

"Can that ever be proven? Of course it can't.

"Does it give the court pause as to the reliability of the verdict being based solely on the evidence admitted? Yes it does.

"The paper cut comment. This remark was not offensive in the same manner as Mr. Hagerdon's previous arguments were, but it minimized and trivialized obvious evidence of a brutal beating, rather than dealing with the evidence in some reasonable manner.

"This crime scene was awash with the victim's blood, which the uncontroverted evidence at trial showed was the direct result of a beating by the defendant to include a broken jaw.

"The injuries suffered by this woman were quite disturbing.

"For Mr. Hagerdon to compare them to a paper cut served no legitimate trial strategy, and again, could have offended some of the jurors who could not help but be moved by the suffering of—this woman endured and angered by comparing them to a paper cut.

"Taken together, these offensive and unprofessional comments caused Mr. Hagerdon's closing argument to fall below an objective standard of reasonableness."

The State agrees Hagerdon's comments were "offensive" and "foolish." But it argues the remarks were not so prejudicial they denied Ellie a fair trial. However, the district court found Ellie had not proven, and probably could not prove, these comments alone changed the outcome of his trial.

In conclusion, the district court found Hagerdon had made a number of errors that constituted deficient performance. Some of these errors were a direct result of Hagerdon's conflict, while others were not. Even so, none of these errors resulted in prejudice individually. Thus, under the *Strickland* standard, Ellie had not shown Hagerdon was ineffective.

In a cumulative error analysis, we collectively consider all errors, even if those errors would individually be harmless, to determine if their combined effect denied the defendant a fair trial. In conducting this analysis, we examine the errors in the context of the entire record, considering how the district court dealt with the errors as they arose; the nature and number of errors and their interrelationship; and the strength of the evidence. *Williams*, 308 Kan. at 1462. No prejudicial error will be found if the evidence against the defendant is overwhelming. *Anderson*, 308 Kan. at 1267.

The only trial errors Ellie has alleged all relate to Hagerdon's representation. The district court agreed many of these alleged errors constituted deficient performance. But based on the evidence, none of the errors on its own amounted to prejudice. Nevertheless, the court found, in the aggregate, these errors denied Ellie a fair trial: (1) failure to file a motion in limine to keep out evidence of Ellie's Halloween costume; (2) his comments during closing argument; (3) failure to timely file a rape shield motion; (4) failure to locate W.H.; (5) inadequate trial preparation; and (6) failure to research the State's upward durational departure or explain it to Ellie.

Hagerdon made several related errors. He admitted he did not have the time or resources to help Ellie, and he was inadequately prepared for trial. This would include his failure to file the motion in limine, his failure to file a timely rape shield motion, and his failure to research upward durational departures. His failure to locate W.H. also contributed to the effect of these errors.

Hagerdon's comments in closing argument also compounded his failure to file a motion in limine. The evidence of Ellie's Halloween costume had little evidentiary value other than casting Ellie in a bad light. The jury could have attributed Hagerdon's comments to Ellie, also.

While Hagerdon made several related errors, the effect of these errors must still be considered within the context of the evidence. The evidence supporting Ellie's aggravated battery conviction was overwhelming. The State had to prove Ellie knowingly caused great bodily harm to W.H. See K.S.A. 2011 Supp. 21-5413(b). W.H. and Clarke both testified Ellie repeatedly hit W.H. While Blue claimed he did not see Ellie hit W.H., he did testify W.H. was bloody after being left alone with Ellie for several minutes. And both responding officers and the trauma surgeon testified W.H. had several injuries, including a broken jaw.

The evidence supporting Ellie's other charges was weaker. To prove aggravated kidnapping, the State had to show Ellie (1) took or confined W.H. by force or threat; (2) with the intent to hold W.H. to inflict bodily injury on or terrorize her; and (3) bodily harm was inflicted on W.H. See K.S.A. 2011 Supp. 21-5408(b). The State presented three possible theories of kidnapping.

The first theory was Ellie kidnapped W.H. when he dragged her out of Blue's bedroom into the living room. Clarke testified he saw Ellie dragging W.H. But W.H. testified she was already in the living room when Ellie first hit her.

20

The State's second theory was Ellie kidnapped W.H. by pulling her out of the apartment. Both W.H. and Blue testified Ellie pulled her out of the apartment. But the State did not present any evidence showing Ellie did this for any reason other than to get her out of the apartment.

The State's third theory was Ellie kidnapped W.H. when he shut the door to Blue's apartment. Clarke testified Ellie shut the door but did not lock it. Blue testified the door was shut and locked when he got back to his apartment. W.H. did not say anything about the door being shut. She also testified Blue and Clarke were in the room during the beating. On direct appeal, the *Ellie* court found sufficient evidence supported the State's theory that Ellie kidnapped W.H. by shutting and locking the apartment door. 2015 WL 2342137, at *6. But while the evidence is sufficient, it is not necessarily overwhelming.

The evidence supporting the rape charge was even weaker. The State had to prove Ellie knowingly engaged in sexual intercourse with W.H. without her consent when W.H. was overcome by force or fear. See K.S.A. 2011 Supp. 21-5503(a)(1). Ellie's rape conviction essentially came down to W.H.'s testimony. W.H. originally denied being sexually assaulted, but she later testified Ellie had inserted his fingers into her vagina. W.H. claimed Blue and Clarke were in the room at the time, laughing. But Blue denied seeing the rape. W.H. also made many other inconsistent statements. For instance, she originally told police both Ellie and Blue took off her clothes, and Ellie, Blue, and Clarke all kicked her.

Looking at Hagerdon's errors in light of the evidence, cumulative error only prejudiced Ellie as to the aggravated kidnapping and rape convictions. Thus, the district court was correct to reverse those convictions and order a new trial. Since the evidence of aggravated battery was overwhelming, there can be no prejudicial error. Since Ellie also

21

did not establish prejudice under the *Strickland* standard, the district court erred in reversing the conviction for aggravated battery.

Affirmed in part and reversed in part.